Patricia **BARTLETT**

v.

**JOHN HANCOCK MUTUAL LIFE INSURANCE CO.**

No. 86–268–M.P.

Supreme Court of Rhode Island.

March 10, 1988.

Aram Schefrin, Lovett, Schefrin & Gallogly, Ltd., Providence, for plaintiff.

Matthew T. Oliverio, Hanson, Curran & Parks, Providence, for defendant.

## OPINION

SHEA, Justice.

This case is before us on the defendant's petition for certiorari seeking review of a Superior Court order granting the plaintiff's motion to compel production of the defendant insurance company's claim file. The plaintiff alleged that the defendant both breached its duty under a contract of life insurance and acted in bad faith by denying liability for accidental death benefits under the policy in which the plaintiff was named as sole beneficiary. We quash the order of the Superior Court.

On June 24, 1984, Paul Anjoorian, plaintiff's father, fell on the sidewalk in front of his house in Providence, Rhode Island, and injured his neck. He was admitted to the intensive-care unit at the Miriam Hospital, where he was placed in a Philadelphia collar for his neck injury and treated with Decadron and Librium.[1] According to the hospital report, he was clearly inebriated at

---

1. Philadelphia collar: a cervical collar used in trauma cases.
 Decadron: a drug used primarily as an anti-inflammatory agent in treating various conditions. The Sloane–Dorland Annotated Medical–Legal Dictionary 184, 197 (1987).

 Librium: a drug used in treatment of anxiety, tension, chronic alcoholism, or alcohol withdrawal. The Sloane–Dorland Annotated Medical–Legal Dictionary 136, 411.

the time of his admission and had a history of heavy, chronic alcohol intake for many years.

On June 30, 1984, Anjoorian was transferred from the Miriam Hospital to St. Joseph's Hospital at the request of his family. His diagnosis upon discharge from the Miriam Hospital was a cervical spine injury with cervical cord injury. While at St. Joseph's Hospital he became intermittently confused and unruly and was confined to his bed through the use of a posey.[2] He also continued to wear the Philadelphia collar.

On the evening of July 9, 1984, Anjoorian was disoriented and cried out frequently from his bed. The nursing staff made frequent visits to his room. In the early morning of July 10, 1984, a nurse found Anjoorian seated on the floor against the right side of his bed. The Philadelphia collar was intact, and the bib of the posey was found around the collar and between the top of the collar and his chin. The straps of the posey were still tied to the bed frame.

Anjoorian was not breathing and did not respond to the nurse. He had been incontinent and had vomited. The hospital staff's efforts to revive him failed. According to the report of the State Medical Examiner, the cause of his death was "a respiratory failure secondary to aspiration pneumonia, mucopurulent bronchitis with atelectasis and emphysema."[3] The manner of death was described as "natural/accident."

In September 1984 defendant authorized a payment of $50,000 to plaintiff under the basic death-benefit terms of the contract. However, in December 1984 it denied her claim of an additional $50,000 under the accidental death benefits of the policy.

In October 1985 plaintiff filed a complaint in two counts, alleging that defendant's refusal to pay the accidental death benefits constituted both a breach of the insurance contract and a bad-faith refusal to pay the claim pursuant to G.L. 1956 (1985 Reenactment) § 9-1-33.[4]

In her request for production of documents plaintiff asked for a copy of the policy, every document in defendant's claim file, all correspondence between plaintiff and defendant, all investigation reports in connection with Anjoorian's death, and a copy of defendant's report of the investigation entitled "Special Activities". The defendant objected to plaintiff's request on the grounds that it called for the production of materials protected from discovery because they are attorney-client communications or materials prepared in anticipation of litigation.

---

**2.** Posey: a vestlike garment to which straplike cords are attached; used to restrain a patient to *a bed or a chair.*

**3.** Aspiration pneumonia: "[P]neumonia due to the entrance of foreign matter, such as food particles, into the respiratory passages * * * ." The Sloane-Dorland Annotated Medical-Legal Dictionary 559.
Mucopurulent: "[C]ontaining relatively conspicuous proportions of mucous material." Steadman's Medical Dictionary 893 (5th Unabridged Lawyers' ed. 1982).
Bronchitis: "Inflamation of mucous membrane of the bronchial tubes." Steadman's Medical Dictionary 195.
Atelectasis: "[C]ollapse of a lung." The Sloane-Dorland Annotated Medical-Legal Dictionary 69.
Emphysema: "[A] *pathological accumulation of air in tissues or organs;* applied especially to *such a condition of the lungs.*" The Sloane-Dorland Annotated Medical-Legal Dictionary 247.

**4.** General Laws 1956 (1985 Reenactment) § 9-1-33 provides:

"(a) Notwithstanding any law to the contrary, an insured under any insurance policy as set out in the general laws or otherwise may bring an action against the insurer issuing said policy, when it is alleged said insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions of said policy, *or otherwise wrongfully and in bad faith refused to timely perform its obligations under said contract of insurance.* In any action brought pursuant to this section, an insured may also make claim for compensatory damages, *punitive damages and reasonable attorney fees.* In all cases in which there has been no trial in the Superior Court on or before May 20, 1981, the question of whether or not an insurer has acted in bad faith in refusing to settle a claim shall be a question to be determined by the trier of fact. (b) The provisions of this section shall apply to all actions against insurers which have been commenced and are pending in any state or federal court on May 20, 1981."

The plaintiff filed a motion to compel defendant to comply with her request for production. A hearing on the motion was held in May 1986. At the hearing the trial justice ordered defendant to produce its entire claim file. He based his decision solely on the fact that plaintiff's complaint contained a bad-faith claim against defendant.

The question before us is whether the trial justice erred in ordering defendant to produce its entire claim file upon plaintiff's mere allegation of bad faith while the underlying breach-of-contract claim for accidental-death benefits was still pending.

■ The plaintiff argues that because she is alleging that defendant acted in bad faith in denying her claim, she should have complete access to defendant's claim file. She states that the documents in defendant's claim file are of the utmost relevance in determining whether defendant acted in bad faith. In support of this argument she cites *Brown v. Superior Court in and for the County of Maricopa,* 137 Ariz. 327, 670 P.2d 725 (1983). In *Brown,* the court dealt solely with a bad-faith claim against an insurer and not with the underlying contract claim. The court allowed the plaintiff complete access to the insurer's claim file. It reasoned that

"bad-faith actions against an insurer, like actions by client against attorney, patient against doctor, can only be proved by showing exactly how the company processed the claim, how thoroughly it was considered and why the company took the action it did. * * * [I]n an action such as this the need for the information in the file is not only substantial, but

overwhelming." *Id.* at 336, 670 P.2d at 734.

Although that reasoning may be acceptable in a case in which bad faith is the only issue, it cannot be applied when the underlying contract claim is still pending.

■ This court has previously decided that certain reports prepared by an insurer are entitled to protection from discovery in a breach-of-contract action under Rule 26(b)(2) of the Superior Court Rules of Civil Procedure.[5] In *Fireman's Fund Insurance Co. v. McAlpine,* 120 R.I. 744, 391 A.2d 84 (1978), we held that "statements taken by a claim agent immediately after an accident are taken in anticipation of litigation." *Id.* at 753, 391 A.2d at 89 (quoting *Almaguer v. Chicago, Rock Island & Pacific R.R.,* 55 F.R.D. 147, 149 (D. Neb. 1972)). Because these statements were taken in anticipation of litigation, they were entitled to a "qualified privilege" under Rule 26(b)(2). This privilege is qualified because the opposing party who seeks production of materials prepared in anticipation of litigation may obtain the materials only upon a showing that " 'a denial of production or inspection will result in an injustice or undue hardship.' The determination of this issue is vested in the sound discretion of the trial justice, who should look at the facts and circumstances of each case in arriving at an ultimate conclusion." 120 R.I. at 754, 391 A.2d at 90. Therefore, in the present controversy, while the liability under the contract for insurance is still at issue, certain documents in defendant's claim file are protected by the qualified privilege of Rule 26(b)(2).[6] To grant total

---

5. Rule 26(b)(2) of the Superior Court Rules of Civil Procedure in pertinent part, states:

"*Limitations.* A party shall not require a deponent to produce or submit for inspection any writing obtained or prepared by the adverse party, his attorney, surety, indemnitor, or agent in anticipation of litigation and in preparation for trial unless the court otherwise orders on the ground that a denial of production or inspection will result in an injustice or undue hardship; nor shall the deponent be required to produce or submit for inspection any part of a writing which reflects an attorney's mental impressions, conclusions, opinions, or legal theories, or, except as

provided hereinafter and in Rule 35, the conclusions of an expert engaged in anticipation of litigation and in preparation for trial."

6. At this stage of the proceedings we are unable to determine which of defendant's documents may be entitled to this privilege. However, we need not determine this issue at this juncture. The defendant refused to identify the contents of the claim file and objected to the production of it on the grounds that the claim file was prepared in anticipation of litigation. As Professor Moore has noted:

"[A] party may not simply claim that materials have been prepared in anticipation of liti-

access to an insurer's claim file at this stage in the proceedings would irreparably prejudice the insurer's ability to defend itself on the contract. Such irreparable prejudice can be avoided.

 Furthermore, there can be no cause of action for an insurer's badfaith refusal to pay a claim until the insured first establishes that the insurer breached its duty under the contract of insurance. In *Bibeault v. Hanover Insurance Co.*, 417 A.2d 313 (R.I. 1980), we held that "[t]o show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id.* at 319 (quoting *Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978)).

Clearly plaintiff could never show an absence of a reasonable basis for denial of benefits if the insurer can prove that no benefits were owed under the policy. If the insurer prevails on the breach-of-contract action, it could not, as a matter of law, have acted in bad faith in its relationship with its policyholder. There cannot be a showing of bad faith when the insurer is able to demonstrate a reasonable basis for denying benefits. (*See also* "If a claim is 'fairly debatable,' no liability in tort will arise." *Bibeault*, 417 A.2d at 319. "Since the evidence gives rise to a valid question of coverage, it follows that [the insurer] could not have acted in bad faith." *Calenda v. Allstate Insurance Co.*, 518 A.2d 624, 629 (R.I. 1986).)

An expanded definition of the tort of bad faith is found in *National Savings Life Insurance Co. v. Dutton*, 419 So.2d 1357 (Ala. 1982), where the Supreme Court of Alabama quoted from its earlier opinion in *National Security Fire & Casualty Co. v. Bowen*, 417 So.2d 179 (Ala. 1982). It "define[d] the recently recognized tort of bad

faith refusal to pay a valid insurance claim." There it said:

"An insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact. * * * No lawful basis 'means that the insurer lacks a legitimate or arguable reason for failing to pay the claim.' * * * When a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.

"Under those authorities the plaintiff in a 'bad faith refusal' case has the burden of proving:

(a) an insurance contract between the parties and a *breach* thereof by the defendant; [Emphasis added.]

"(b) an intentional refusal to pay the insured's claim;

"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;

"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

"In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim." 419 So.2d at 1361.

It follows then that a plaintiff cannot obtain complete discovery of a defendant's claim file by bringing simultaneous breach-of-contract and bad-faith claims. A plaintiff must first show that he or she is enti-

---

gation; it must specify the basis for the objection and the items of work product involved." 4 *Moore's Federal Practice*, # 26.64[2] at 26–353–54 (2d ed. 1987).

Therefore, at the appropriate time and consistent with our holding in this case, defendant

insurer will have the responsibility for identifying generally the various materials in its claim file and will have to set forth a reason for application of the qualified privilege of Rule 26(b)(2).

tled to recover on the contract before he or she can prove that the insurer dealt with him or her in bad faith.

Other courts have reached this same conclusion when faced with the discovery problem presented by simultaneous breach-of-contract and bad-faith claims against an insurer. In *In re Bergeson*, 112 F.R.D. 692 (D. Mont. 1986), a bankruptcy trustee filed a two-part complaint against an insurer for failing to fulfill its obligations under the insurance contract and for acting in bad faith in refusing to tender the full amount of coverage to the debtors under the contract. The plaintiff sought production of the insurer's entire claim file. The insurer objected on the grounds of attorney-client and work-product privilege. The court decided that an insurer's claim file should be disclosed in a bad-faith action. However, it would not allow discovery of the entire claim file until the breach-of-contract claim had been resolved. "For the claims file to be discoverable, the underlying claim must first be resolved, either by settlement or litigation. Otherwise, privileged material may be disclosed which would jeopardize the insurance company's defense." *Id.* at 697. Similarly, in *Allstate Insurance Co. v. Swanson*, 506 So.2d 497 (Fla. Dist. Ct. App. 1987), the insurer was sued for breach of contract under a homeowners' policy. The insured also alleged bad-faith refusal by Allstate to settle within policy limits. The court decided that a bad-faith claim could not arise until the insurer's liability under the contract was resolved. "[A] claim for bad faith cannot be prosecuted when the parties simply disagree over the coverage issue." 506 So.2d at 498. The court would not allow discovery of the insurer's claim file based on plaintiff's bad-faith allegation while the contract action was still pending. "Until the right of coverage is first established, a plaintiff claiming to be an insured cannot compel disclosure of the insurer's work product and privileged matters in its claims file. * * * Otherwise the discovery rule established by the courts in these cases could be circumvented by simply combining the two causes of action." *Id.*

This reasoning is also endorsed in the very case upon which plaintiff incorrectly relies. That case holds that a bad-faith claim against an insurer entitles the plaintiff to have access to the insurer's claim file. However, in a footnote at the outset of *Brown v. Superior Court in and for the County of Maricopa*, the Supreme Court of Arizona pointed out that the bad-faith claim was before it on a special-action proceeding. Consequently it was unable to determine if the plaintiff was simultaneously claiming breach of the insurance contract. The justices pointed out,

"Should [the breach of contract claim] terminate adversely to Brown, one would assume that the bad-faith claim must fall. Obviously, there are many problems involved in allowing a claimant simultaneously to pursue both a claim under the coverage provided by the policy and a bad-faith claim based upon the insurer's refusal to pay the policy claim. One could plausibly argue that the law should not allow such simultaneous actions and that a bad-faith claim can be pursued only after disposition of the underlying policy claim." 137 Ariz. at 330 n.1, 670 P.2d at 728 n.1.

Another case that dealt with simultaneous claims of breach of contract and bad-faith dealings against an insurer stressed the prejudicial effect of complete disclosure of the claim file on the insurer's right to defend the breach-of-contract action. In *Maryland American General Insurance Co. v. Blackmon*, 639 S.W.2d 455 (Tex. 1982), a bank sued its fidelity insurer, alleging both breach of contract and bad-faith-dealing causes of action. The court held that the insurer's qualified privilege against discovery in a contract cause of action is not vitiated by the plaintiff's allegation of bad-faith dealings. The insurer had a right to assert this privilege as long as its liability on the contract remained undetermined. The court stated:

"Regardless of the other reasons which might justify the use of this information, it would be impossible to limit the prejudicial effect of disclosure on [the insurer's] right to defend the contract cause of action. Moreover, if a plaintiff at-

tempting to prove the validity of a claim against an insurer could obtain the insurer's investigative files merely by alleging the insurer acted in bad faith, all insurance claims would contain such allegations." *Id.* at 457–58.

We have found no authority or precedent, nor has plaintiff cited any, that allows a policyholder to obtain complete access to an insurer's claim file by bringing simultaneous claims of bad faith and breach of contract against an insurer before the underlying action on the contract has been resolved in favor of the policyholder. We conclude, therefore, that the trial justice in this case was in error in ordering production of defendant's entire claim file based upon plaintiff's mere allegation of bad faith. When both claims are brought simultaneously, the insurer is entitled to a qualified privilege against discovery on the breach-of-contract claim as provided by Rule 26(b)(2), in regard to all materials in the claim file that the insurer can demonstrate were prepared in anticipation of litigation. Allowing full disclosure of the insurer's claim file based solely on plaintiff's allegation of bad faith would invite all plaintiffs to include a bad-faith claim with every breach-of-contract claim.

██ In deciding how to resolve a similar controversy, the United States District Court for the District of Montana in *In re Bergeson,* concluded that the only way to deal with this problem was to separate the badfaith claim from the breach-of-contract claim and first determine the insurer's liability under the contract. "Given the need for complete discovery to be afforded to all parties to the action, the interest of justice would best be served by bifurcating the bad faith claims from the remainder of the case and determining the liability issue first." 112 F.R.D. at 697. This appears to us to be the most sound and logical solution. In *National Savings Life Insurance Co. v. Dutton,* the Supreme Court of Alabama acknowledged that the plaintiff in these cases has a heavy burden, that is, that "[i]n the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim,

the proof offered must show that plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law." 419 So.2d at 1362. We therefore suggest that trial justices, or motion-calendar judges who encounter this situation, exercise their authority pursuant to Rule 42(b) to sever the contract claim from the bad-faith claim and limit discovery to the contract claim until that claim is resolved in plaintiff's favor.

We recognize that a plaintiff may have an overwhelming need for the information in the claim file to enable him or her to prove his or her bad-faith claim. That need, however, is outweighed by (1) the right of the insurer to defend itself first against the claim of breach of contract pursuant to the rules of civil procedure and (2) the fact that a bad-faith claim may not be maintained until the insurer is proven to have breached the contract of insurance.

For these reasons the defendant's petition for certiorari is granted, the order of the Superior Court is quashed, and the papers of the case are remanded to the Superior Court with our decision endorsed thereon.