Barbara CORRENTE,

v.

FITCHBURG MUTUAL FIRE INSURANCE COMPANY.

No. 87–333–Appeal.

Supreme Court of Rhode Island.

April 21, 1989.

Charles P. Cavas, William A. Poore, Hodosh, Spinella & Angelone, Providence, for plaintiff.

Lauren E. Jones, Jones & Aisenberg, Edward P. Sowa, Jr., Gunning, LaFazia & Gnys, Inc., Providence, for defendant.

OPINION

WEISBERGER, Justice.

This case comes before us on the appeal of Fitchburg Mutual Fire Insurance Company (Fitchburg) from a judgment entered in the Superior Court in favor of Barbara Corrente (Corrente) in the sum of $16,650 (together with statutory interest in the sum of $10,989, making a total judgment of $27,639) in compensatory damages for theft loss, and $25,000 in punitive damages as a result of alleged bad faith on the part of Fitchburg in settling this claim. We reverse and remand. The facts of the case insofar as pertinent to this appeal are as follows.

On December 21, 1979, Fitchburg issued a homeowner's policy to Corrente. Shortly after the policy was issued, a "scheduled personal property endorsement" was added covering certain jewelry and silverware. This endorsement covered silverware appraised by a representative of Ross–Simons Jewelers on an "as told to me" basis in the amount of $12,630.50 and jewelry appraised by a representative of the same jewelry

firm on the basis of inspection in the sum of $5,725.

In January 1981 Corrente submitted a claim to Fitchburg based on theft loss arising out of a break into her residence. This claim was made for six pieces of jewelry on the scheduled property. The claim was paid, and six pieces of jewelry were deleted from the policy. This reduced the total jewelry coverage to $4,615.

On or about August 3, 1981, Corrente's apartment was again subjected to a forceable break, and certain jewelry and all her scheduled silverware were stolen. Immediately thereafter, Corrente executed an "insured's statement and claim form, theft burglary loss," and filed it with her insurance agent. This form set forth the items lost, together with the age of the items and their appraised value where applicable, and claimed the total sum of $17,650.50. Most of the items listed were gifts. Other items listed were scheduled as having been paid for in cash. Attached to the claim form was a police report of the North Providence police department concerning the break.

Approximately five months later, Fitchburg requested that Corrente be interviewed by two of its investigators. One interview was recorded on tape and, when reduced to writing, covered about forty-two pages of transcript (as presented at the trial). Throughout this interview Corrente stated that she was unable to say where and when the silverware had been purchased, that it was a gift from her parents, and that much of her jewelry had been purchased in Italy and given to her over the years by her mother. When the investigators inquired about obtaining information concerning these items from her parents, Corrente flatly refused on the grounds that her father had recently suffered a heart attack and had not been told about the loss. Consequently she forbade any attempt to obtain any information from her parents.

The investigators posed some tactless and unproductive questions concerning whether any of the jewelry had been smuggled into the country and indicated that the questioning had "pretty well torn [her] apart." Corrente testified that when the tape recorder was turned off to turn the tape over, one of the investigators suggested that she might thereafter be followed. However, an examination of the interview as a whole clearly indicates that the investigators gained no more specific knowledge after questioning Corrente than they had at the beginning. No information was given concerning the place of purchase or the current value of either the jewelry or the silverware, though it was generally suggested that the silverware had been purchased at Ross–Simons Jewelers or Tilden–Thurber Jewelers. Thereafter, Fitchburg requested that Corrente sign another statement, and she then hired an attorney who prepared an affidavit that was executed on April 15, 1982. This affidavit set forth the facts surrounding the incident, stated that the articles were gifts from her parents and grandparents, and asserted that the total value of the stolen items was $17,650.50. She stated that she had no receipts for their purchase.

On April 30, 1982, Fitchburg requested that Corrente give a statement under oath at the office of its attorney. Although Corrente received this notice and was advised by her counsel that under the terms of her policy she was required to comply with any reasonable request for a deposition, she refused to do so on the ground that she would not submit herself to an ordeal of the type that she had undergone in her interview with Fitchburg's investigators.

On July 7, 1982, Corrente submitted a "sworn statement in proof of loss." This proof of loss set forth generally the total amount of the claim in the sum of $17,650.50, and deducted the amount of $100 as required by the policy, making a total claim of $17,550.50. The proof of loss did not schedule the items upon which the claim was based, nor did it set forth the place of purchase for any items. It did not set forth the amount of depreciation or the value of said items at the time of the loss. This proof of loss was rejected on July 30, 1982, by counsel for Fitchburg on the ground that Corrente had refused to sub-

mit to an examination under oath and because "the amounts claimed in the proof of loss are in excess of the actual loss allegedly sustained and [because she had] failed to prove ownership or proper title to those items." The instant action was commenced that same day.

The complaint consisted of two counts. The first count sought to recover the monetary loss pursuant to the contract. The second count sought punitive damages based upon the company's bad faith in its refusal to honor its contract of insurance.

Fitchburg asserts a number of arguments in support of its appeal. These arguments will be considered in the order of their significance to this opinion rather than in the order in which they are raised in Fitchburg's brief.

I

THE MOTION TO SEVER

We have stated in *Bartlett v. John Hancock Mutual Life Insurance Co.*, 538 A.2d 997 (R.I.1988), that the most practical resolution of discovery and prejudice problems when a bad-faith claim is combined in a single action with a breach-of-contract claim on the policy is that "trial justices, or motion-calendar judges who encounter this situation, exercise their authority pursuant to Rule 42(b) to sever the contract claim from the bad-faith claim and limit discovery to the contract claim until that claim is resolved in plaintiff's favor." *Id.* at 1002. It is true that we were dealing in *Bartlett* with a discovery problem. However, we also adopted the rule in *Bartlett* that had been stated earlier in *National Savings Life Insurance Co. v. Dutton*, 419 So.2d 1357 (Ala.1982):

"'An insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact. * * * No lawful basis "means that the insurer lacks a legitimate or arguable reason for failing to pay the claim." * * * When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.

"'Under those authorities the plaintiff in a "bad faith refusal" case has the burden of proving:

'(a) an insurance contract between the parties and a *breach* thereof by the defendant;

'(b) an intentional refusal to pay the insured's claim;

'(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

'(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;

'(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

" 'In short, plaintiff must go beyond a mere showing of nonpayment and prove a *bad faith* nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.' " (Emphasis added.) 419 So.2d at 1361.

This definition was added to our earlier definition contained in *Bibeault v. Hanover Insurance*, 417 A.2d 313 (R.I.1980), where we held that "[t]o show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id.* at 319 (quoting *Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 691, 271 N.W.2d 368, 376 (1978)).

In effect, we cited with approval the test adopted by the Supreme Court of Alabama in *Dutton* that "[i]n the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as

a matter of law." *Bartlett,* 538 A.2d at 1002 (quoting *Dutton,* 419 So.2d at 1362).

■ Since the burden of proof on a bad-faith claim is so formidable, we are of the opinion that whether or not a discovery issue is involved, it is inherently prejudicial for a trial justice to decline to sever that claim from a breach-of-contract claim. In essence, unless the trial justice finds that the plaintiff is entitled to recover on the breach-of-contract claim as a matter of law, there is no question for the jury on the bad-faith claim. Consequently the trial justice erred in denying the motion to sever. We wish to make it very clear that issues of judicial economy do not warrant the trial of two such claims together.

## II

## WAS PLAINTIFF ENTITLED TO RECOVER ON THE BREACH-OF-CONTRACT CLAIM AS A MATTER OF LAW?

■ Clearly the facts of this case indicate that the breach-of-contract claim was at least fairly debatable. The policy of insurance required in this case, as in all such homeowner policies, that in the event of loss:

"The insured shall give immediate written notice to this Company of any loss, * * * furnish a complete inventory of the * * * property, showing in detail quantities, costs, actual cash value and amount of loss claimed; and within sixty days after the loss, unless such time is extended in writing by this Company, the insured shall render to this Company a proof of loss, signed and sworn to by the insured * * *. The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company * * * .

"No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with."

It is undisputed in the case at bar that plaintiff did not submit to a sworn deposition as requested by the company. It is further undisputed that the proof of loss submitted by plaintiff filed more than sixty days after the loss did not show "in detail quantities, costs, [or] actual cash value" at the time of the loss. Indeed, in *Daniel v. Pawtucket Mutual Insurance Co.,* 506 A.2d 1032 (R.I.1986), we affirmed a directed verdict in favor of the insurer on the ground that the insured had filed a proof of loss that did not contain complete information (her descriptions regarding where she purchased many of the items were vague and certain items were simply designated as gifts), and on the further ground that the insured failed to appear and give a sworn statement under oath. The circumstances of this case that so closely parallel the facts in *Daniel* make it abundantly clear that plaintiff was not entitled to recover as a matter of law and that her claim was at least debatable. It shall later be pointed out in this opinion that the amount of her loss claimed in the proof of loss was significantly greater than the amount supportable by her own expert's testimony.

Consequently we are of the opinion that plaintiff did not establish that her claim was not fairly debatable and that she was entitled to judgment on the breach-of-contract count as a matter of law. Therefore, Fitchburg was entitled to a directed verdict on the bad-faith claim. The trial justice erred in failing to grant Fitchburg's motion for directed verdict in respect to count 2.

## III

## WAS FITCHBURG ENTITLED TO A DIRECTED VERDICT ON THE CONTRACT CLAIM?

We have already concluded that Corrente did not satisfy two conditions of her policy, namely, the filing of a proof of loss in terms that would satisfy the policy requirements and, her failure to appear for a deposition as required by the policy. She argues, however, that she should properly be absolved from these two requirements by reason of having submitted to lengthy

interrogations (though unsworn) by two investigators designated by Fitchburg. One interview was conducted by Arthur Currier, an insurance adjustor, and one interview was conducted by Currier and Ernest Reed, a special investigator. Although plaintiff's answers were vague in response to the questions propounded at these interviews, a trier of fact might deem that she gave to the investigators all the information that she had. Her lack of knowledge as to the source of the jewelry, save that they were gifts from her parents and grandparents, would not have been cured if she had given these answers under oath.

Corrente also points out in respect to the proof-of-loss condition that she had provided a notice to Fitchburg that itemized all the items that had been lost and contained an estimated value based on appraisals from Ross–Simons. These were the same appraisals that had been given to Fitchburg in February 1980 when she added the theft endorsement to her policy.

We have stated in *Siravo v. Great American Insurance Co.*, 122 R.I. 538, 410 A.2d 116 (1980), that the failure to submit a timely proof of loss will not defeat recovery unless the insurer can demonstrate that it has been prejudiced. We were dealing with the question of timeliness in that case. However, in the case at bar, we cannot say that a question of fact was not presented in respect to whether Fitchburg was prejudiced by the untimely and inadequate proof of loss and by Corrente's declining to submit to a sworn deposition. It was undisputed that the value of the items would of necessity be established by appraisals of which the company had notice. The source of purchase of the items, while no doubt of interest, could scarcely be said to be critical since these items ranged in age from four to ten years.

In reviewing the trial justice's decision on a motion for directed verdict, we apply the oft-stated doctrine that we are bound by the same rules that govern the trial justice. We must examine all the evidence in the light most favorable to the nonmoving party, without considering the weight of the evidence or the credibility of the witnesses. We must draw from that evidence only those reasonable inferences that support the position of the nonmoving party. If such analysis reveals issues upon which reasonable minds could differ, the motion for directed verdict should be denied and the jury should be allowed to resolve the issues of fact presented. *See, e.g., Souza v. Narragansett Council, Boy Scouts of America,* 488 A.2d 713 (R.I. 1985); *Bitgood v. Allstate Ins. Co.,* 481 A.2d 1001 (R.I.1984); *AAA Pool Service & Supply, Inc. v. Aetna Casualty & Surety Co.,* 479 A.2d 112 (R.I.1984); *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's Inc.,* 474 A.2d 436 (R.I.1984); *Katz v. Prete,* 459 A.2d 81 (R.I.1983).

■ Although it may be a close question concerning whether the conduct of the investigators was sufficiently egregious to excuse Corrente from failing to submit to the deposition, we must concede that certain of their questions created such an atmosphere of hostility and accusation as to cause reasonable minds to differ concerning whether this conduct barred Fitchburg from insisting upon the sworn deposition. Therefore, the trial justice did not err in declining to grant Fitchburg's motion for a directed verdict on the contract claim.

## IV

### MOTION FOR NEW TRIAL

Fitchburg is entitled to a new trial based upon the trial justice's refusal to grant its motion to sever since we have already decided that it is inherently prejudicial to try a breach-of-contract claim on an insurance policy together with a bad-faith claim.

■ However, there are additional reasons why the trial justice should have granted Fitchburg's motion for a new trial. We shall deal with these reasons by way of guidance to the trial justice who shall preside at the next trial of this case. The jury awarded plaintiff $16,550 as compensatory damages. It is undisputed that plaintiff was entitled only to the actual cash value of the stolen items at the time of the loss.

The expert testimony presented by Stephen J. Mulcahey, the general manager of

the Warwick branch of Ross–Simons Jewelers, indicated that the jewelry appraisals performed by him in 1980 had been done when the value of gold was at its peak. He testified that the actual cash value of these items had been significantly reduced during the following year. He stated that the value of gold items at the time of the theft was between 30 percent to 40 percent lower than at the time of the appraisal and that the diamond items should be reduced by 25 percent. Corrente then introduced an appraisal of the sterling silver items as of the date of the loss in the sum of $5,773.

Taking the testimony of Barbara Corrente as true and her witness' testimony as completely accurate, the diamond rings upon which she claimed a loss would have had a cash value of $1,162.50, at the time of the loss, applying the 25 percent reduction. The gold items had an aggregate appraised value of $2,970. If one reduces the value of the items by 30 percent, the lower end of the range testified to by Mr. Mulcahey, the actual cash value at the time of loss would be $2,079. The unscheduled jewelry (including a topaz ring that was vigorously contested) would have a limit under the policy of $500.

Thus the taking of Corrente's testimony as true and the testimony of her expert witness and the written appraisal as wholly credible, there would be a total proven loss of $9,514.50. The policy provided for a $100 deductible amount, and thus the net claim could not exceed $9,414.50.

In denying Fitchburg's motion for new trial, the trial justice obviously overlooked or misconceived the applicable evidence on cash value of the stolen items as of the time of loss. He approved a jury verdict based upon appraised value at the time the endorsement was added to the policy. Such a value did not constitute the amount to which the plaintiff was entitled under any theory. Corrente had the burden of proving her actual cash loss as of the time of the theft. Neither the jury nor the trial justice could inflate the claim beyond the amount established by the evidence she presented to prove damages. Consequently the trial justice erred in refusing to grant Fitchburg's motion for a new trial.

For the reasons stated, the appeal of Fitchburg is sustained in part and denied in part. The judgment of the Superior Court is vacated, and the papers in the case are remanded to the Superior Court for a new trial on the breach-of-contract claim. The Superior Court is directed to enter judgment in favor of Fitchburg on the bad-faith claim.