951 A.2d 1041 (2008)
401 N.J. Super. 449
Leona C. TADDEI and Margaret Taddei, his wife, Plaintiffs-Appellants/Cross-Respondents,
v.
STATE FARM INDEMNITY COMPANY,[1] Defendant-Respondent/Cross-Appellant.
No. A-3806-06T2.
Superior Court of New Jersey, Appellate Division.
Argued June 4, 2008.
Decided June 30, 2008.
*1042 Amos Gern, Roseland, argued the cause for appellants/cross-respondents (Starr, Gern, Davison & Rubin, P.C., attorneys; John Ratkowitz, of counsel and on the brief).
Thomas P. Weidner argued the cause for respondent/cross-appellant (Windels, Marx, Lane & Mittendorf, LLP; attorneys; Mr. Weidner, of counsel and on the brief; David F. Swerdlow, Princeton, on the brief).
Law Offices of Schiffman, Abraham, Kaufman & Ritter, P.C., attorneys for amicus curiae ATLA-NJ (Evan L. Goldman, on the brief).
Before Judges LISA, SIMONELLI and KING.
The opinion of the court was delivered by
LISA, J.A.D.
Plaintiff, Leona C. Taddei, was injured in a vehicular accident he alleged was caused by the negligence of the unknown driver of another vehicle with which his vehicle had no contact. Plaintiff was insured by State Farm Indemnity Company (State Farm), and his policy included uninsured motorist (UM) coverage in the amount of $100,000 per person and $300,000 per accident. Plaintiff made a UM claim against State Farm. After efforts to resolve the claim were unsuccessful, plaintiff, and his wife suing per quod, brought this action against State Farm. The complaint alleged causative negligence against the unknown driver, the existence of the UM policy with State Farm, and the inability of the parties to resolve the claim through arbitration, as a result of which plaintiff demanded damages for his injuries and for his wife's loss of consortium. The complaint did not allege bad faith by State Farm.
The case went to trial, and the jury rendered a verdict of $2,500,000 for plaintiff and $100,000 for his wife. Over plaintiff's objection, the judge molded the verdict to reflect the UM coverage limits and entered judgment for $100,000.
Plaintiff appeals, arguing that the judge erred in molding the verdict to the coverage limits, and should have entered judgment for the full $2,600,000, plus prejudgment interest on that sum. Plaintiff further argues that, regardless of the amount of the judgment, the judge erred in failing to award prejudgment interest. We reject plaintiff's argument that the judge erred in molding the verdict to conform with the coverage limits, but we agree with plaintiff that prejudgment should have been awarded. Accordingly, we affirm the judgment, modified to include prejudgment interest.[2]
*1043 The accident happened on July 18, 2001 in Totowa. Plaintiff was taken by ambulance to a local hospital, complaining of pain in his neck and left shoulder. He was evaluated and released with a prescription for pain medication. Two days later, plaintiff consulted a physician after experiencing pain in both shoulders and in his back. For the next four months, plaintiff received physical therapy and massage treatments three times a week. Over the course of the next year, plaintiff consulted with several physicians, who prescribed various treatment modalities, including physical therapy, epidural steroid injections, and cryo therapy.
In May 2003, plaintiff consulted with Dr. Mark Drzala. Based upon his physical examination and review of medical records and diagnostic studies, he diagnosed plaintiff with the following: low back pain syndrome; lumbar degenerative disc disease; lumbar discogenic syndrome; central L5-S1 herniated nucleus pulposis with radiculopathy; grade one L5-S1 retrolisthesis; cervicalgia; left-sided cervical facet syndrome; cervical discogenic syndrome; small focal disc protrusions at the C3-C4, C4-C5, C5-C6, and C6-C7 levels; right shoulder rotator cuff tear; and right shoulder instability. Drzala obtained further diagnostic studies and confirmed and refined his diagnoses.
In July 2003, Drzala performed an intradiscal electrothermal procedure on plaintiff's lumbar spine. This minimally invasive procedure involves putting a needle in the disc through which a flexible copper wire is inserted that wraps around the disc and heats it to 100. The purpose is to thermally modulate the protein in the disc so that it stabilizes. The procedure typically lasts sixteen-and-one-half minutes and has a fifty percent success rate. Following the procedure, plaintiff felt better, but by January 2004, the pain in his back returned. Drzala discussed several surgical options with plaintiff, but ultimately advised against them, and plaintiff has undergone no further surgical procedures.
At the time of the accident, plaintiff, then thirty-six years old, was a miscellaneous mechanic for PSE & G. His job duties required him to perform renovation, electrical, welding, and fabrication work. He missed only three days of work following the accident, and, throughout these proceedings, continued to work at the same job, although he contends he has had to tailor his work assignments because of physical restrictions. He also has curtailed some household chores and participation in activities with his teenage children.
In May 2003, plaintiff's attorney submitted the UM claim to State Farm, and over the next several months forwarded copies of plaintiff's medical reports and records. State Farm submitted the medical information to Dr. Lawrence P. Floriani, who issued a report to State Farm on September 29, 2003, concluding that plaintiff's injuries were as reported by Drzala, were caused by the accident, and that all treatment received to date and recommended was consistent with the injuries and their severity.
On October 30, 2003, State Farm denied plaintiff's UM claim, contending it had information that plaintiff was at fault for the accident. State Farm relied on plaintiff's description of the accident as reflected in the police report and the entry in the police report that driver inattention by plaintiff may have contributed to the accident. Plaintiff demanded UM arbitration. A panel of three arbitrators conducted a hearing on March 21, 2005. They found the unknown driver 100% at fault and awarded plaintiff $92,500 for his injuries.
The parties remained at an impasse in their efforts to resolve the claim. On April *1044 1, 2005, State Farm voluntarily paid plaintiff $50,000, thus reducing the available coverage by that amount. It was understood that State Farm's payment and plaintiff's acceptance of the $50,000 was without prejudice to plaintiff's right to receive a higher amount through "continuing negotiation or alternative means of resolution," and would not constitute a waiver of any defenses State Farm might have "now or in the future, under the policy." On April 15, 2005, State Farm formally rejected the arbitrators' decision and, pursuant to the policy terms, advised plaintiff that if he wished to pursue the matter further he would have to file a Superior Court action, in which State Farm would demand a trial by jury.
Plaintiff filed his complaint on April 26, 2005. As we stated, it contained no allegation of bad faith by State Farm. It sought only compensatory damages for plaintiff's injuries and his wife's loss of consortium.
On May 24, 2006, mandatory nonbinding arbitration was conducted. See R. 4:21A-1. The arbitrator found the unknown driver 100% at fault and awarded plaintiff $87,500. On July 19, 2006, State Farm rejected the arbitrator's award and requested a trial de novo. See R. 4:21A-6.
Shortly before trial, plaintiff expressed a willingness to settle for $87,500. State Farm offered $25,000 in addition to the $50,000 it had already paid. The parties again reached an impasse, and the case proceeded to trial in January 2007.
While addressing pretrial motions to the court, plaintiff's attorney, apparently for the first time, mentioned during the colloquy that he believed he had a "potential bad faith case" against State Farm, to which State Farm's attorney commented, "that's the first time I've heard that. Also, the Court will note from the pleadings there's no  bad faith  pled  position. I don't believe bad faith existed  certainly not in this juncture and given the  posture where we are."[3]
Plaintiff and his wife testified, and Drzala's videotaped deposition was presented to the jury. State Farm presented no witnesses. The court granted plaintiff's motion for a directed verdict on the issue of proximate cause of the injuries. As we stated, the jury returned a verdict of $2,500,000 for plaintiff and $100,000 for his wife.
State Farm's counsel requested that the judge mold the verdict to reflect the limits of coverage and enter judgment for $100,000. State Farm contends that this procedure was discussed between counsel and the court in pretrial off-the-record discussions. It is unclear whether plaintiff's counsel immediately objected to molding the verdict. State Farm's counsel later submitted a proposed form of judgment awarding $100,000 to plaintiff, without interest, and no cause for action on the per quod claim of plaintiff's wife.
On February 2, 2007, plaintiff's counsel objected and submitted a proposed form of judgment, which provided for awards of $2,500,000 to plaintiff and $100,000 to his wife, plus prejudgment interest on the full amount. In his letter of objection, plaintiff's counsel reiterated that in the pretrial colloquy, he commented regarding his belief that State Farm was acting in bad faith. He further contended that "evidence of their [sic] bad faith in this claim was only buttressed by what occurred over the course of this trial," referring to the pretrial order limiting the trial to damages, *1045 State Farm's failure to call any witnesses, and the directed verdict on proximate cause of injury. Plaintiff's counsel objected to molding the verdict "given the absence of any opportunity to investigate State Farm's total disregard of the facts and circumstances that led to the Jury's verdict in this case." He expressed the view that "it is simply impossible for State Farm to justify their [sic] decision to offer less than their [sic] policy limits to resolve this claim." Counsel concluded that molding the verdict to conform with the policy limits "may necessitate filing an appeal simply to protect any rights my clients may have to initiate a separate cause of action against State Farm to obtain discovery in support of a first-party bad faith litigation."
Counsel for State Farm responded, contending there was no factual or legal basis for plaintiff's assertion of bad faith. Counsel pointed out that State Farm made an advance of $50,000 and offered an additional $25,000, in the face of plaintiff's final pretrial willingness to accept $87,500 to settle the case.[4] Counsel further noted that plaintiff never pled an allegation of bad faith and argued that plaintiff "cannot now create an additional cause of action where one was not alleged before."
On February 8, 2007, the judge signed the order for judgment submitted by State Farm. Plaintiff's counsel inquired as to whether the judge had generated an opinion or made findings on the record, or intended to do so, with respect to the order. The judge responded that notwithstanding the objection of plaintiff's counsel "as it pertained to an allegation of a `bad faith claim', the Court molded the verdict and entered a judgment in favor of the Plaintiff at the policy limits of $100,000.00, and entered a no cause of action on the per quod claim." The judge concluded:
The Court has not and does not intend to generate an opinion or place any findings on the record relative to the Plaintiff's first party "bad faith claim". The issue has not been squarely presented to the Court for its disposition and the entry of judgment should not be interpreted in any way as reflecting a ruling by this Court on the first party insurer "bad faith claim".
This appeal followed. Plaintiff argues that because State Farm acted in bad faith in delaying the resolution of his UM claim and refusing to pay the full policy limits to settle the claim, State Farm should be liable for the full $2,600,000 awarded by the jury, plus prejudgment interest on that amount. He argues that State Farm's bad faith is either conclusively established or at least prima facie established by the high jury verdict. He relies upon Pickett v. Lloyd's, 131 N.J. 457, 621 A.2d 445 (1993), in which our Supreme Court authorized a first-party bad faith claim for property damage and loss of use of a commercial vehicle, and Miglicio v. HCM Claim Management Corp., 288 N.J.Super. 331, 672 A.2d 266 (Law Div. 1995), in which the Pickett principles were applied in an underinsured motorist (UIM) action. Plaintiff further argues there is no court rule or other authority authorizing a trial court to "disregard and reduce" a jury verdict by molding it in the manner done here. He contends that any reduction in the verdict would require a formal motion for judgment notwithstanding the verdict pursuant to R. 4:40-2, a motion not made in this case. Finally, getting to the crux of plaintiff's argument, he contends that molding the verdict was error because *1046 it may have a preclusive effect under the entire controversy doctrine with respect to his intended bad faith claim against State Farm. We find these arguments unpersuasive.
In his February 2, 2007 letter to the trial court, plaintiff's counsel forecast that molding the verdict "may necessitate filing an appeal" to protect his client's rights to bring a separate bad faith claim against State Farm. In his appellate brief, filed with this court on August 22, 2007, plaintiff's counsel informed us that on that day he filed a new action in the Law Division against State Farm alleging violations of the New Jersey Consumer Fraud Act, common law fraud, negligent misrepresentation, breach of the duty of good faith and fair dealing, and a violation of the New Jersey civil RICO statute.[5] The brief then stated: "This appeal seeks to preserve the plaintiffs' rights in the event that the defendant attempts to argue that the trial court's decision to mold the verdict bars such an action under the entire controversy doctrine."
In essence, plaintiff asks us to create a cause of action providing a remedy in the UM context similar to that provided on third-party claims in Rova Farms Resort, Inc. v. Investors Insurance Co. of America, 65 N.J. 474, 323 A.2d 495 (1974). Plaintiff and amicus ATLA-NJ set forth policy arguments, contending that unless such a remedy is provided, insurers will have no incentive to conscientiously and timely settle meritorious UM claims[6] because they have nothing to lose if the limit of their risk is the limit of their coverage. Thus, even if they might also be assessed prejudgment interest, that is a minimal additional exposure, and really does not provide any incentive, because they have held the money all along and received the benefit of it.
State Farm correctly points out that the record contains no evidence of any pervasive industry strategy to stonewall UM claims for nefarious purposes as alleged by plaintiff and amicus. State Farm further points out that plaintiff could have availed himself of the offer of judgment rule, R. 4:58, which provides a reasonable and authorized remedy and an incentive to an adverse party to settle.
There are other policy considerations on both sides of this issue, pertaining, for example, to the effect on the policy-holding public and the court system that would result from the relief plaintiff seeks. We need not delve into the competing interests, because we are convinced that under prevailing New Jersey Supreme Court precedents, we, as one of eight panels of this State's intermediate appellate court, would be ill-advised to authorize the novel cause of action plaintiff seeks. See Miller v. Zoby, 250 N.J.Super. 568, 578, 595 A.2d 1104 (App.Div.), certif denied, 127 N.J. 553, 606 A.2d 366 (1991); Coyle v. Englander's, 199 N.J.Super. 212, 219-20, 488 A.2d 1083 (App.Div. 1985).
The Rova Farms model simply does not apply in the first party coverage context. The remedy in Rova Farms was based on the unique fiduciary relationship that arose out of a general liability insurance policy. Rova Farms, supra, 65 N.J. at 492-96, 323 A.2d 495. The policy prohibited the insured from participating in the settlement of the third-party claim against it. Id. at 479, 323 A.2d 495. The Court found that this created a fiduciary duty on the part of the insurer to act in good faith in attempting to settle the claim. Id. at 496, 323 A.2d 495. This duty was of particular *1047 importance because the insured was personally liable for any damages in excess of the policy limit. Id. at 492, 323 A.2d 495. The Court reasoned that, in essence, an insurer choosing not to settle within the limits of coverage should not be permitted to gamble with its insured's money. Id. at 501-02, 323 A.2d 495.
That rationale does not carry over to the first party context. The insured's assets are not placed at risk for failure to settle within the policy limits. See McMahon v. N.J. Mfrs. Ins. Co., 364 N.J.Super. 188, 193, 834 A.2d 1074 (App.Div.2003) (commenting in dicta that the Rova Farms bad faith model is inapplicable in UM and UIM claims "because the insured is the claimant and, therefore, not exposed to an award in excess of the policy limits").
Pickett is also unavailing to plaintiff. That case dealt with a property damage claim, the value of which indisputably exceeded the policy limits, but which the insurer inexcusably failed to pay in a timely manner, causing consequential damages to the insured. Pickett, supra, 131 N.J. at 461-64, 621 A.2d 445. The insured sued the insurer, alleging improprieties in the handling of the claim. Id. at 464, 621 A.2d 445. The jury awarded $70,000 in damages, finding that the insurer was responsible for his consequential losses. Ibid. The Supreme Court upheld the award. Id. at 481, 621 A.2d 445. It reasoned that, like all contracts, the insurance contract contained a covenant of good faith and fair dealing in its performance and enforcement, the breach of which entitled the insured to recover damages beyond the policy limits. Id. at 467, 621 A.2d 445.
In its analysis, the Court considered legislative enactments regulating the insurance industry and defining and prohibiting unfair practices. Id. at 467-68, 621 A.2d 445. Among them is the practice of "`[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.'" Ibid. (quoting N.J.S.A. 17:29B-4(9)(f)).[7] Although the statutory provisions and corresponding regulatory framework do not create a private cause of action, they declare a state policy consistent with the common law duty of good faith and fair dealing. Id. at 468, 621 A.2d 445.
The Court further concluded that insureds should have a remedy under first-party policies in which the insurer breaches its duty to its insured by acting in bad faith, which can be established by showing that no debatable reason existed for the denial of benefits. Id. at 468-473, 621 A.2d 445. The insurer must have no valid reason to delay processing the claim, and must have known or recklessly disregarded the fact that no reasonable basis existed for denying the claim. Id. at 473, 621 A.2d 445. Finally, the Court concluded that recoverable damages should be limited to consequential economic losses that were fairly within the contemplation of the insurer. Id. at 474-75, 481, 621 A.2d 445. And, absent egregious circumstances, no right to recovery for punitive damages would attach to an insurer's allegedly wrongful refusal to pay a first-party claim. Id. at 476, 621 A.2d 445.
The Court adopted a "fairly debatable" standard to establish bad faith. Id. at 473, 621 A.2d 445. The standard requires that "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for *1048 an insurer's bad-faith refusal to pay the claim." Ibid.
Although the claim before us and the claim in Pickett are both first-party claims, the similarities end there. Pickett involved a property damage claim, the amount of which was susceptible of objective determination. The claim in the case before us is an unliquidated bodily injury claim, which, by its nature, is subjective. The sustainable amount of potential recovery for such a claim typically covers a very broad range. Further, the amount of the claim in Pickett was undisputed, and it was undisputed that the plaintiff's damages exceeded the available policy limits. Those circumstances do not exist in this case. Two arbitration tribunals, made up of individuals experienced in evaluating personal injury claims, assessed plaintiff's damages below the policy limits. State Farm contends that those awards were more than reasonable, particularly considering that although plaintiff suffered significant injuries, he missed little time form work, restrictions on his work and personal activities have not been great, and his treatment has been primarily conservative, including only a very minimally invasive spinal procedure. On the other hand, the jury sized up the claim very differently and rendered a very generous award.
We agree with plaintiff that Pickett stands for the proposition that he has the right to assert a claim against his UM carrier for breaching the covenant of good faith and fair dealing implied in the insurance contract. However, following Pickett, his measure of damages, if he could prove bad faith, would be any foreseeable consequential damages. This might typically include, for example, costs of litigation, including expenses for experts and counsel fees, and prejudgment interest. However, such damages are not measured by the amount of damages determined by the jury for his injuries.
Finally, although it is not before us in the posture in which this case comes to us, we express some reservation as to whether Pickett's "fairly debatable" formulation, based on the summary judgment standard, should apply when evaluating good faith in failing to settle an unliquidated bodily injury claim, as opposed to an undisputed property damage claim. We note, for example, the approach taken by the Rhode Island Supreme Court:
Although we decline to abandon the fairly debatable standard and recognize that an insurer is entitled to debate a claim that is fairly debatable, we are not persuaded that an insurer is relieved of its obligations to deal with its insured consistent with its implied in law obligations of good faith and fair dealing simply because the claim is fairly debatable. . . . The insurer's failure to conduct an appropriate and timely investigation may subject the insurer to bad faith liability notwithstanding the merits of the claim. Although a fairly debatable claim is a necessary condition to avoid liability for bad faith, it is not always a sufficient condition. Rather, we are satisfied that the appropriate inquiry is whether there is sufficient evidence from which reasonable minds could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.
[Skaling v. Aetna Ins. Co., 799 A.2d 997, 1011 (R.I.2002) (internal quotation marks and citations omitted).]
We are not persuaded by State Farm's argument that the offer of judgment rule provides the sole remedy available to a UM or UIM claimant who believes his or her carrier acted in bad faith *1049 in handling the claim. It is now settled that the offer of judgment rule does apply to UM and UIM cases. McMahon, supra, 364 N.J.Super. at 190, 834 A.2d 1074. The benefit of the offer of judgment rule is that it is mechanical in its application and requires no proof of bad faith, by whatever standard is deemed relevant. The shortcoming is that it provides for recovery of only some consequential damages.[8]
We can conceive of no reason to limit a UM claimant's remedy, if he or she believes the insurer has acted in bad faith, to the offer of judgment rule. The existence of the rule should not bar an aggrieved insured from pursuing a meritorious claim against the insurer for breach of the covenant of good faith and fair dealing, and the ability to recover all consequential damages, and, in an exceptional and particularly egregious case, even be permitted to pursue punitive damages. The situation here is not the same as in Endo Surgi Center, P.C. v. Liberty Mutual Insurance Co., 391 N.J.Super. 588, 592-94, 919 A.2d 166 (App.Div.2007), where we held that a bad faith claim was not maintainable against an insurer for alleged bad faith in withholding payment of personal injury protection (PIP) benefits because the statutory procedures and remedies for enforcement of an insured's right to PIP benefits, including the right to interest on overdue payments, are exclusive as part of the scheme of the No-Fault Act, N.J.S.A. 39:6A-1 to -35. No such statutory scheme provides an exclusive remedy in the UM or UIM context.
We reject plaintiff's argument that the trial court lacked authority to mold the verdict to enter judgment in plaintiff's favor in the amount of the policy limits, and to enter a no cause for action judgment on plaintiff's wife's per quod claim.
It is common practice in New Jersey to reduce the jury's damages award in a UM/UIM case to reflect the policy limits of one's UM/UIM coverage. See, e.g., McMahon, supra, 364 N.J.Super. at 190-91, 834 A.2d 1074 (upholding motion judge's molding of $500,000 jury verdict to $175,000 policy coverage limit, plus interest, fees and costs under offer of judgment rule); Krohn v. Full Ins. Underwriters Ass'n, 316 N.J.Super. 477, 485, 720 A.2d 640 (App.Div.1998), certif. denied, 158 N.J. 74, 726 A.2d 937 (1999) (finding that the amount from the prior settlement with the tortfeasor should have been credited against plaintiff's UIM policy instead of jury's damage award). Likewise, it is common practice to limit a spouse's per quod claim to the UM/UIM policy limit. See, e.g., Einwechter v. Marciano, 311 N.J.Super. 492, 496-97, 710 A.2d 573 (App.Div.1998) (finding wife's per quod claim was covered by same portion of an insurance policy providing UM motorist benefits for her spouse's personal injuries); In re Harris v. Security Ins. Group, 140 N.J.Super. 10, 12-15, 354 A.2d 704 (App. Div.1976) (vacating $15,000 arbitration award entered in favor of injured party and spouse and remanding for entry of judgment for the policy limit of $10,000; husband's per quod claim recovery to be included within policy limit); Williams v. State Farm Mut. Auto. Ins. Co., 99 N.J.Super. 377, 379, 240 A.2d 38 (Law Div.1968), aff'd, 104 N.J.Super. 403, 250 *1050 A.2d 155 (App.Div.1969), aff'd, 54 N.J. 580, 258 A.2d 368 (1969) (finding that husband's per quod claim was subject to the $25,000 policy limit for bodily injury).
UM and UIM cases are first-party contract claims against insurers, but they are generally tried as if they were third-party tort actions with the insurer standing in for the uninsured or underinsured tortfeasor. Cynthia M. Craig & Daniel J. Pomeroy, New Jersey Auto Insurance Law § 23:3-3 at 416 (2008). For that reason, jurors are not made aware of the insured's existing insurance policy coverage. See Krohn, supra, 316 N.J.Super. at 484, 720 A.2d 640. Thus, courts have appropriately recognized the need to mold jury verdicts in these cases to reflect the rights and duties of the parties under the insurance policy. We find no error in the judge's action in molding the verdict.
We now address the procedural difficulty with plaintiff's position. In Pickett, for example, there was no initial suit by the insured against the insurer to collect the insurance proceeds that were due. They were paid without litigation, albeit in an untimely manner. The plaintiff then initiated the bad faith suit against his insurer. Pickett, supra, 131 N.J. at 464, 621 A.2d 445. In Miglicio, the complaint contained counts alleging bad faith by the UIM carrier in handling the claim and sought compensatory and punitive damages based on that alleged bad faith. Miglicio, supra, 288 N.J.Super. at 337, 672 A.2d 266. Thus, the issue was in the case, and even after the carrier paid the limits of its coverage on the underlying claim, the plaintiff was able to pursue the bad faith claim. Id. at 346-47, 672 A.2d 266.
In the case before us, however, bad faith was never pled. The pleadings never requested consequential damages resulting from any alleged bad faith. At no time during the course of the litigation did plaintiff move to amend his pleadings to include such a claim. The casual mention of a possible bad faith claim at the commencement of trial was not sufficient to place the matter at issue, nor was the unfounded argument after the high verdict was returned that the judgment should reflect the full amount of the verdict. Thus, we find no error in the trial judge's refusal to address plaintiff's belated claim of bad faith. The issue was never before the trial court, and it is not properly before us.
A fundamental difference between a third-party bad faith claim and first-party bad faith claim is that in the former the insurer is not a party to the underlying litigation against the insured, and only after an excess verdict does the claim ripen by exposing the personal assets of the insured, thus necessitating a new lawsuit regarding the bad faith allegations. But with a first-party claim, the insurer is in the litigation from the outset, and any claims of bad faith can be asserted in the same litigation. If not initially pled, but events occur during the pendency of the litigation which give rise to the plaintiff's belief that the carrier has acted in bad faith, a motion can be made to amend the pleadings, which would preserve the issue for plaintiff by either including it in the present litigation or reserving it for later litigation if the court so orders.
We reject plaintiff's argument that because the jury can not be told about insurance in the trial of the UM case, see Krohn, supra, 316 N.J.Super. at 483, 720 A.2d 640, the claims cannot be brought in the same action. To respect the rights of all parties, the underlying claim could be severed from the bad faith claim, with the latter being held in abeyance until conclusion of the former. The severed bad faith claim would then be activated, triggering the possibility for the right to discovery, *1051 motions, and, if necessary, a separate trial. See Bartlett v. John Hancock Mut. Life Ins. Co., 538 A.2d 997, 1000-02 (R.I. 1988). In this way, the plaintiff's ability to pursue a potential bad faith claim would be preserved, but the insurer would not be required to produce its claim file prematurely, "[o]therwise, privileged material may be disclosed which would jeopardize the insurance company's defense." Id. at 1001.
Whether plaintiff's second case, now pending in the Law Division, is subject to dismissal under the entire controversy doctrine is not for us to decide. That decision must be made in that litigation. Our discussion is not intended to affect that determination. We have discussed the principles we deem relevant and necessary to explain why the trial judge in this case did not err in declining to rule upon plaintiff's late bad faith assertion.
Finally, we address plaintiff's argument that the judge erred in not awarding prejudgment interest. Prejudgment interest in UM cases is allowable on the same terms and conditions as permitted in similar contract actions. Derfuss v. N.J. Mfrs. Ins. Co., 285 N.J.Super. 125, 135, 666 A.2d 599 (App.Div.1995); Childs v. N.J. Mfrs. Ins. Co., 199 N.J.Super. 441, 452, 489 A.2d 1203 (App.Div.1985), rev'd on other grounds, 108 N.J. 506, 531 A.2d 723 (1987). Thus, prejudgment interest may be awarded on contract actions in accordance with equitable principles. Pressler, Current N.J. Court Rules, comment on R. 4:42-11 (2008). Generally, the equitable purpose of an award of prejudgment interest in a contract action is to compensate or indemnify the claimant for the loss of what the money due would presumably have earned if the payment had not been delayed. Ellmex Constr. Co. v. Republic Ins. Co., 202 N.J.Super. 195, 212-13, 494 A.2d 339 (App.Div.1985), certif. denied, 103 N.J. 453, 511 A.2d 639 (1986).
State Farm concedes that prejudgment interest is allowable in the discretion of the court based upon equitable principles in a case such as this. It urges that if awarded interest should be limited to the $50,000 remaining due and should only run from the date plaintiff filed his complaint, namely April 26, 2005.
The trial judge did not express any reasons for not awarding prejudgment interest. In order to bring this matter to a conclusion, we exercise our original jurisdiction, R. 2:10-5, and determine that it is equitable to compensate plaintiff for the loss he suffered by the delayed payment of the additional $50,000. Accordingly, prejudgment interest shall be payable from April 26, 2005.
The judgment is modified to reflect an award of prejudgment interest as set forth in the preceding paragraph. In all other respects, the judgment is affirmed.
Affirmed as modified.
NOTES
[1] Improperly pled as State Farm Mutual Automobile Insurance Company.
[2] State Farm has cross-appealed from the trial court's ruling that State Farm was precluded by virtue of the policy provisions from contesting at trial the issue of liability and was bound by the UM arbitration panel's determination that the unknown driver was 100% at fault. State Farm acknowledged at oral argument that if it prevailed on plaintiff's appeal, the issue raised in its cross-appeal regarding interpretation of the policy provisions pertaining to the effect of the UM arbitration panel's decision would be moot as to this case. Because of our disposition of plaintiff's appeal, we therefore will not address State Farm's cross-appeal, which is dismissed as moot.
[3] Plaintiff moved at that time to limit the trial to the issue of damages. Over State Farm's opposition, the judge agreed, finding that under the terms of the policy, the UM arbitrators' decision regarding liability was binding.
[4] State Farm also maintained, as it has on its cross-appeal, that the trial court erred in precluding it from trying liability, and that it had a meritorious basis upon which the jury might have found plaintiff at least partially at fault in causing the accident.
[5] Apparently two claims adjusters were also individually named.
[6] These policy considerations would also apply to UIM claims.
[7] In context, we believe the phrase "in which liability has become reasonably clear" refers to the obligation of the insurer to pay the amount claimed by its insured, as opposed to reasonably clear liability but uncertain damages.
[8] Amicus ATLA-NJ argues that an inherent shortcoming in the offer of judgment rule is the requirement that its remedial benefits are triggered only if the claimant obtains a "judgment" of at least 120% of the offer. R. 4:58-2(a). Thus, if excess judgments are to be molded to the amount of coverage limits, a UM or UIM claimant would have to reduce his or her offer of judgment to at least 20% below the policy limits. Although we do not pass upon the issue, because it is not now before us, a sensible reading of "judgment" in Rule 4:58-2(a) in this context would probably be to deem it the jury's verdict.