**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0754-15T1
                       A-0808-15T1

PENN NATIONAL INSURANCE
COMPANY,

      Plaintiff-Appellant,

v.

GROUP C COMMUNICATIONS, INC.,

      Defendant-Respondent.

_____

G.M. SIGN, INC., individually
and on behalf of a certified
class as judgment creditors of
GROUP C COMMUNICATIONS, INC.,

      Intervenor-Respondent.

_____

PENN NATIONAL INSURANCE
COMPANY,

      Plaintiff-Respondent,

v.

GROUP C COMMUNICATIONS, INC.,

      Defendant-Appellant.

_____

G.M. SIGN, INC., individually
and on behalf of a certified
class as judgment creditors of
GROUP C COMMUNICATIONS, INC.,

       Intervenor-Appellant.

_____

Argued April 16, 2018 — Decided July 31, 2018

Before Judges Messano, O'Connor, and Vernoia.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-0134-09.

Richard C. Mason argued the cause for appellant in A-0754-15 (Cozen O'Connor and Kinney Lisovicz Reilly & Wolff, PC, attorneys; Kevin E. Wolff and Richard C. Mason, of counsel and on the briefs; Timothy P. Smith and Kathleen J. Devlin, on the briefs).

Jeffrey A. Berman (Anderson & Wanca) of the Illinois bar, admitted pro hac vice, argued the cause for respondents in A-0754-15 (Giordano, Halleran & Ciesla, PC, and Jeffrey A. Berman, attorneys; Michael J. Canning, of counsel and on the brief; Jeffrey A. Berman and Matthew N. Fiorovanti, on the brief).

Phillip Bock (Bock, Hatch, Lewis and Oppenheim, LLC) of the Illinois bar, admitted pro hac vice, argued the cause for appellants in A-0808-15 (Giordano, Halleran & Ciesla, PC, and Phillip Bock, attorneys; Michael J. Canning, of counsel and on the brief; Jeffrey A. Berman and Matthew N. Fiorovanti, on the brief).

Richard C. Mason argued the cause for respondent in A-0808-15 (Cozen O'Connor and Kinney Lisovicz Reilly & Wolff, PC, attorneys; Richard C. Mason and Samantha M. Evans, of counsel and on the briefs; Kevin E. Wolff,

Timothy P. Smith, and Kathleen J. Devlin, on the briefs).

PER CURIAM

During all times relevant to these appeals, Penn National Insurance Company (Penn National) insured Group C Communications Inc. (Group C), a New Jersey corporation, pursuant to a business owner's liability policy (primary policy) and a commercial umbrella policy (umbrella policy). The primary policy provided $1 million in liability coverage "per occurrence," with an aggregate policy limit of $2 million. The umbrella policy provided additional liability coverage of $2 million per occurrence and in the aggregate.

Siblings Edgar Theodore Coene (Ted) and Susan Coene (Susan)[1] served as co-presidents of Group C, which provided information and counsel to businesses regarding their facilities and any contemplated relocation, expansion or consolidation. Among its activities, Group C produced a trade show and conference known as the TFM Show. The 2005 TFM Show was held in Chicago, and, in his advanced planning, Ted met in 2002 with a representative from the Chicago Convention and Tourism Bureau (CCTB) who assured him that the CCTB could help "grow [the] show" by providing local mailing,

---

[1] We use first names to avoid confusion and apologize for the informality.

A-0754-15T1

fax and phone lists for Group C's promotion to both exhibitors and attendees.

Group C acquired those lists from the CCTB and hired Quick Link Information Services, Inc. (Quick Link) to send promotional fliers by fax to those on the lists. Quick Link did so on seven occasions between December 6, 2004 and January 26, 2006, with the last set of faxes advising recipients of the anticipated 2006 show Group C was holding again in Chicago in April.

G.M. Sign Inc. (G.M.), an Illinois company, received an unsolicited fax from Group C on April 15, 2005. In July 2008, G.M. filed a class action suit in state court in Illinois (the underlying action) alleging, among other things, Group C violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. The TCPA makes it unlawful "to use any telephone facsimile machine . . . to send, to a telephone facsimile machine, an unsolicited advertisement," unless certain statutory exceptions apply. 47 U.S.C. § 227(b)(1)(C). The TCPA provides a private right of action to recover the greater of actual damages or $500 "for each . . . violation." Id. at § 277(b)(3).

We described what happened thereafter in our prior opinion. Penn Nat'l Ins. Co. v. Group C Commc'ns, Inc., No. A-2813-09 (App. Div. Aug. 1, 2011) (slip op. at 8-10). The Law Division granted Penn National summary judgment declaring it had no duty to defend

4

or indemnify Group C under the policies. Id. at 10. Group C appealed. Although Penn National had agreed to provide a defense to Group C under a reservation of rights, in June 2010, as a result of the Law Division's judgment, Penn National withdrew its representation of Group C in the underlying action.

In October 2010, G.M. moved for summary judgment in the underlying action, which had been removed to the federal district court for the Northern District of Illinois. Group C did not retain counsel or respond to the motion. On January 10, 2011, the district court granted G.M.'s motion and entered judgment against Group C for $18,966,000 ($500 for each of 37,932 unsolicited faxes sent by Quick Link).[2]

On August 1, 2011, we reversed the Law Division's grant of summary judgement to Penn National, concluding, in part, there was a genuine issue of material fact as to whether there was coverage under both the advertising and property damage insuring provisions of the policies. Id. at 20, 25. We remanded the matter to the Law Division for further proceedings. Id. at 25. The Supreme Court denied Penn National's petition for certification. 209 N.J. 96 (2011).

---

[2] The court amended the judgment to $18,921,000 after considering class members who had opted out.

Thereafter, Group C assigned its rights to G.M. On remand, Group C moved to file an amended answer and counterclaim alleging Penn National acted in bad faith by failing to settle the underlying action.[3] G.M. also moved to intervene in the declaratory judgment action, asserting that Penn National had acted in bad faith. The Law Division judge granted both motions and entered a conforming order.[4]

We discuss the interim motion practice and the judge's pre-trial rulings as necessary below, but for now, it suffices to say that by the time of the trial before a different judge and a jury, Group C's bad faith claims were no longer in the case. The issues left for the jury to decide were: whether G.M. and other class members suffered "property damage" as defined in the policies; whether the "property damage" was the result of one or more than one "occurrence"; and whether Group C acted with subjective intent to cause harm to the fax recipients such that coverage was excluded

---

[3] Earlier in the litigation, before the grant of summary judgment to Penn National, Group C successfully moved to amend its counterclaim but never actually filed an amended counterclaim alleging bad faith in failing to settle the underlying action.

[4] Except when necessary to differentiate between respondents-cross-appellants Group C and G.M., we refer to them simply as Group C.

under the policies' "expected or intended" injury exclusion.[5]

The jury returned a verdict in favor of Group C, finding that: (1) G.M. and the other class members suffered property damage as defined in the policies; (2) Group C had not subjectively expected or intended this damage; and (3) more than one occurrence caused the damage. The judge denied Penn National's subsequent motion for judgment notwithstanding the verdict (JNOV) or a new trial. She granted Group C's application for counsel fees pursuant to Rule 4:42-9(a)(6), awarding $847,110.80 in fees, which was $923,369.26 less than what was sought. On September 3, 2015, the court entered final judgment in favor of Group C for $5,485,129.61 — $4,389,500 in damages, $248,518.81 in prejudgment interest, and $847,110.80 in counsel fees — plus post-judgment interest.

Penn National appealed (A-0754-15), and Group C filed a cross-appeal (A-0808-15). The appeals were argued back-to-back, and we have consolidated them now to issue a single opinion.

## As to A-0754-15

Section A(1)(a) of the primary policy required Penn National to "pay those sums that the insured [became] legally obligated to pay as damages because of . . . 'property damage,' . . . to which

---

[5] Although we previously stated the policies' "advertising injury provisions would appear to be the most logical sources of any coverage," id. at 14, Group C abandoned its "advertising injury" claim prior to trial.

th[e] insurance applie[d]." "Property damage" was defined in section F(15) as:

> a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Section A(1)(b)(1)(a) provided coverage for "property damage" caused by an "occurrence," which was defined in section F(12) as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Section B(1)(a) excluded "property damage" that was "expected or intended from the standpoint of the insured."

Section I(1) of the umbrella policy provided that Penn National would "pay on behalf of the insured the 'ultimate net loss' in excess of the 'applicable underlying limit' which the insured becomes legally obligated to pay as damages because of . . . Property Damage Liability." The definitions of "property damage" and "occurrence," and the exclusion for "property damage" that was "expected or intended from the standpoint of the insured," were the same as in the primary policy.

I.

Penn National argues the judge erred in denying its motions for a directed verdict at the close of Group C's case and for JNOV because there was no evidence G.M. and other members of the class suffered "property damage" as defined by the policies.

George Matiasek, the owner of G.M., testified at trial. He identified the fax he received from Quick Link and claimed that such unsolicited faxes caused loss of time, tied up his fax machine making it unavailable for legitimate business faxes, and possibly wasted ink and toner. His company relied heavily on a fax machine for submitting bids and receiving signed orders, and on one occasion, he lost an order because faxes were delayed. Matiasek did not know any of the other class members in the underlying action, but said they must have been in the class because of a "successful [fax] transmission," which Matiasek defined as having "received" a fax.[6] However, Matiasek admitted he did not know if the fax machine of any class member actually used toner, ink or paper to print a fax sent by Quick Link on Group C's behalf.

The report of Robert Biggerstaff, an expert retained by G.M., was admitted into evidence at trial, and both parties read to the jury excerpts from Biggerstaff's deposition. The federal district

---

[6] Matiasek testified that his company had participated in approximately 100 TCPA lawsuits.

court's opinion and order in the underlying action referenced Biggerstaff's opinion regarding the number of faxes "successfully transmitted" by Quick Link, and used that number as the basis for its award on summary judgment.

In his deposition, Biggerstaff opined there were five stages of a fax transmission, and a "successful" transmission required completion of all five phases. However, the actual printout of a fax did not occur during these five phases, and, a fax machine could continue to receive additional pages of a fax even though it might begin to print. A fax was "successful" regardless of whether "the recipient actually got a piece of paper out of their fax machine." Based upon his review of the records from Quick Link, Biggerstaff did not know whether any of the class recipients ever received a paper fax transmission.

Penn National argues that, contrary to the trial judge's rulings when denying its motions for a directed verdict and JNOV, Group C did not prove either "physical injury to tangible property" or "loss of use of tangible property" as required by the policies. It asserts that in its successful TCPA action, G.M. was only required to prove that an unsolicited transmission was "directed [at]" a particular fax device, not that an unsolicited fax was printed or that a fax machine was rendered useless. It argues that Biggerstaff's deposition testimony and report simply

described the phases of a successful transmission of a fax and did not establish that any class member suffered "property damage," nor did Matiasek's testimony establish that any other class member suffered "property damage."

Group C counters by arguing the evidence established, at a minimum, the successful transmissions to the class recipients resulted in the admittedly temporary "loss of use of tangible property," i.e., phone lines and fax machines. It contends whether the recipient's fax machine ever printed out Group C's message did not matter for purposes of coverage. Citing the district court's opinion supporting summary judgment in the underlying action, Group C asserts "all members of the underlying class, who had already been adjudged to have had faxes successfully transmitted to them, had their telephone lines and fax machines tied up and thereby lost their use of them."

"Motions for involuntary dismissal, Rule 4:37-2(b), and JNOV, Rule 4:40-2(b), are 'governed by the same evidential standard: [I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according [it] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied.'" Innes v. Marzano-Lesnevich, 435 N.J. Super. 198, 223 (App. Div. 2014) (quoting Verdicchio v. Ricca, 179

11

N.J. 1, 30 (2004) (first alteration in original) (citations omitted), aff'd. as mod., 224 N.J. 584 (2016). "We apply the same standard on review." Ibid. (citing Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)).

Without question, in passing the TCPA, Congress intended to restrict unsolicited faxes, which "impose a cost on the called party" in paper used and "occup[y] the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 76 (3d Cir. 2011) (citations omitted). "The TCPA prohibits sending unsolicited fax advertisements; it does not prohibit the sending of unsolicited fax advertisements only when there are specific harms that a plaintiff can later identify." City Select Auto Sales, Inc. v. David Randall Assoc., Inc., 296 F.R.D. 299, 310 (D.N.J. 2013). "The TCPA 'does not specifically require proof of receipt'" of the fax. Id. at 309 (quoting CE Design Ltd. v. Cy's Crabhouse N., Inc., 259 F.R.D. 135, 142 (N.D. Ill. 2009)).

Undoubtedly, G.M. proved at trial that Group C violated the TCPA, and we reject without further comment Penn National's contention that Matiasek's testimony was incredible and insufficient to demonstrate G.M. suffered property damage as defined by the policies. R. 2:11-3(e)(1)(E). However, we agree

12

with Penn National that Group C was not entitled to indemnification simply because the judgment in the underlying action proved violations of the TCPA as to other class members. The mere fact that by enacting the TCPA Congress intended to address the annoyance of unwanted faxes, and the potential loss of time, toner, ink and temporary inutility of the machine itself, was insufficient to prove <u>actual property damages</u> as defined by the policies. Group C's right to indemnification required such proof. See <u>Bldg. Materials Corp. of Am. v. Allstate Ins. Co.</u>, 424 N.J. Super. 448, 458 (App. Div. 2012) (holding indemnitee "cannot establish a prima facie case of covered loss simply by demonstrating that the class action claimants alleged potential [covered] damage; rather, it must show that the underlying settlement actually included payment for such claimed damages").

Neither Biggerstaff's report nor his deposition testimony proved any other class member suffered a "[p]hysical injury to tangible property" from the offending faxes it received. Matiasek clearly testified he had no idea what happened to other members of the class, only that he knew, based upon Biggerstaff's report that the faxes were "successful." During his deposition, Biggerstaff was asked:

> [Q.] Just because a facsimile has indicated it being successful from the sender does not

necessarily mean a piece of paper came out of the recipient's fax machine, correct?

[A.]  That is correct.

There was no proof that the class members' fax machines printed out the faxes, i.e., thereby depleting the use of ink, toner or paper.

The policies also covered damages that resulted from the "loss of use" of property that was not damaged.  Contrary to Group C's assertion, there was no proof that other class members lost the use of their phone lines or fax machines because of Quick Link sending them a fax on behalf of Group C.  In fact, contrary to Group C's assertion, neither Biggerstaff's report nor his deposition testimony demonstrated the unwanted faxes deprived a class member of the use of its phone line or its fax machine.

As a result, Penn National's motion for a directed verdict or its motion for JNOV should have been granted as to all claims for property damage under the policies, save the one asserted and proved by G.M.

## II.

As noted, because the policies' intentional conduct exclusion would have denied Group C coverage if it expected or intended the property damage suffered by G.M. and the other class members, the jury was asked to decide whether Group C "subjectively expect[ed]

or intend[ed] the property damage." See Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 183-84 (1992) (explaining "the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury," and "require[s] an inquiry into the actor's subjective intent to cause injury").

In our prior decision reversing summary judgment, we held "that a good faith belief that the businesses contained on the CCTB list obtained by Group C were willing to receive faxes from other business entities would preclude application of the intentional conduct exclusion." Penn National, slip op. at 24.[7]

_____

[7] Our prior opinion failed to address significant authority from other courts holding that the receipt of unsolicited faxes in violation of the TCPA did not trigger property damage coverage under of business liability policies. For example, although we cited to Terra Nova Ins. Co. v. Fray-Witzer, 869 N.E. 2d 565, 571 (Mass. 2007), and its discussion of Voorhees, see Penn National, slip op. at 23, we failed to note that the Supreme Judicial Court of Massachusetts held there was no coverage for property damage arising from unsolicited faxes because any damage was not caused by an accident and hence was not an occurrence under the policy. Terra Nova, 869 N.E. 2d at 570-71.

Similarly, in St. Paul Fire & Marine Ins. Co. v. Brother Int'l Corp., 319 Fed. Appx. 121, 127 (3d Cir. 2009), the court affirmed the grant of summary judgment to the insurer under the policy's property damage insuring provisions. Once again interpreting Voorhees, the court reasoned the insured expected or intended the property damage for which it sought coverage, i.e., the depletion of fax paper and toner, and therefore the insurer properly denied coverage under an exclusion identical to the one
(footnote continued next page)

The judge denied Penn National's request to define "good faith" for the jury by analogizing to the Uniform Commercial Code (UCC), N.J.S.A. 2A:1-201(b)(20), i.e. "honesty in fact."

The judge reasoned the suggested charge was inappropriate because this was not a case involving the UCC. She provided the following instructions:

> The policy's exclusion for expected or intended injury states . . . [t]his insurance does not apply to "property damage" expected or intended from the standpoint of the insured.
>
> Penn National bears the burden of proof to establish that there was no "occurrence" and also that the exclusion applies.
>
> The accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer subjectively intended or expected to cause an injury. If not, then the resulting injury is accidental even if the act that caused the injury was intentional.
>
> You should apply that standard to determine whether or not Group C's conduct falls within the expected or intended injury exclusion.
>
> If you find that Group C ha[d] a good faith belief that the businesses contained in the [CCTB] list . . . were willing to receive faxes from other business entities, then you

---

(footnote continued)
in this case. Ibid.; see also Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co., 432 F. Supp. 2d 488, 510 (E.D. Pa. 2006) (holding that insured's "knowledge about the TCPA and its lack of intent to violate the TCPA are irrelevant to whether it intended to cause the harm that befell Class members").

A-0754-15T1

must find that Group C did not subjectively expect or intend the "property damage."

If you find that Group C did not have a good faith belief that the businesses contained in the [CCTB] list . . . were willing to receive faxes from other business entities, then you must find that Group C did subjectively expect or intend the "property damage."

Penn National argues before us it was reversible error not to provide instructions on "good faith." It further contends that instructions defining "good faith" were particularly necessary because Ted's testimony at trial contradicted his prior certification, referenced in our opinion, id. at 22. Ted certified:

When I acquired the list from the CCTB, I advised that Group C would probably use the list for the dissemination of facsimiles. The CCTB never recommended that I obtain permission from each addressee before doing so and never said I was not allowed to send faxes promoting the TFM Show to the names on the list. This supported my belief that I had permission to fax the document to each company listed by the CCTB, since I reasonably concluded that a governmental entity could not sell a list of facsimile numbers without first receiving permission from those companies.

[Ibid.]

At trial, Ted acknowledged that he did not personally obtain the lists, but rather two of his employees did. He never received any affirmative assurances from the CCTB that the recipients had

consented to receive faxes, but rather assumed a government entity like the CCTB would not provide lists that contained the names of businesses unless they had consented.[8]

We find no reason to reverse. Initially, Penn National's claim that Ted committed a "fraud" on the court because his prior certification was demonstrably false and misled us to reverse the grant of summary judgment in our prior opinion lacks any merit. R. 2:11-3(e)(1)(E). Nor does Ted's trial testimony in and of itself warrant a jury charge defining "good faith." It suffices to say the jury had ample opportunity to consider Ted's credibility.

We agree that an explanation of "good faith" would have helped the jury understand a complicated point, i.e., while Penn National bore the burden to prove the exclusion applied, under our prior holding, it could not shoulder that burden if Group C demonstrated it acted in good faith. There were many sources, other than the UCC, that could have been used to help the jury understand the concept. See, e.g., Model Jury Charge (Civil), 4.10J, "Implied Terms — Covenant of Good Faith and Fair Dealing" (2011) (cases cited in footnotes two and three).

---

[8] During trial, Penn National argued the CCTB's own website indicates that it is not a governmental agency.

A-0754-15T1

In any event, we are convinced the failure to further define "good faith" did not create reversible error in this case precisely because the jury had the opportunity to consider whether Ted "honestly believed" the lists contained only the names of those which consented to receive faxes.

### III.

Because we conclude Group C proved only one occurrence at trial, we need not otherwise address the argument Penn National asserts in Point I of its brief, i.e., there was only one occurrence as a matter of law because all the faxes were the result of a "single misjudgment by Group C." We also find without merit Penn National's contention in Point IV that the Law Division erred in permitting Group C to amend its counterclaim and in permitting G.M. to assert bad faith claims in its intervenor complaint. R. 2:11-3(e)(1)(E).

Lastly, in Point V, Penn National argues the trial judge abused her discretion in awarding fees that included time spent in pursuit of Group C's bad faith claims. We do not agree. The judge severely discounted the fee request based precisely on Group C's lack of success.

However, in light of our decision, we remand the matter to the trial judge for entry of an amended judgment limited to G.M.'s claim, and to conduct a hearing on the appropriate fee award in

19

light of our decision. We leave to the trial court's discretion the conduct of the hearing.

## As to A-0808-15

Before trial, the judge dismissed Group C's bad faith claims on summary judgment, except for the count in its counterclaim that alleged Penn National acted in bad faith by failing to settle the underlying action at a time when it controlled that litigation and could have settled the claim within Group C's policy limits. Group C does not appeal from that order.

However, on the eve of trial, when the parties met to discuss Penn National's various in limine motions, the insurer renewed its attempt to dismiss the bad faith failure to settle claim by arguing Group C's lack of an expert was fatal. Group C objected to the untimeliness of the motion and requested an adjournment if the court was inclined to dismiss for lack of an expert. The judge did not rule on the issue at that time.

After the jury was sworn but before any testimony, the judge questioned counsel as to whether our then-recent decision in Wacker-Ciocco v. Government Employees Insurance Co., 439 N.J. Super. 603 (App. Div. 2015), necessitated dismissal of the bad faith failure to settle claim. Relying on Pickett v. Lloyd's and Peerless Insurance Agency, Inc., 131 N.J. 457 (1993), and Wacker-Ciocco, the judge dismissed the bad faith failure to settle claim

because it was "fairly debatable" whether coverage existed, particularly since the trial court had granted summary judgment to Penn National in 2010 declaring there was no coverage. Relying on Fireman's Fund Insurance Co. v. Security Insurance Co. of Hartford, 72 N.J. 63 (1976), the judge further determined that Group C should have protected its interests and negotiated its own settlement with G.M. once it believed Penn National had breached its obligation to settle the case.

Alternatively, the judge found that any assessment of Penn National's conduct in this complex case was beyond the ken of the average juror and dismissed the bad faith failure to settle claim because Group C had no expert. Noting the case management order required Group C to furnish an expert report nearly one year earlier, she denied any adjournment and dismissed the bad faith failure to settle counterclaim.

Group C now argues it was error for the judge to sua sponte reconsider her earlier denial of summary judgment on this count of its counterclaim. We disagree. See Lombardi v. Masso, 207 N.J. 517, 534 (2011) (quoting Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257 (App. Div. 1987) ("It is well established that 'the trial court has the inherent power to be exercised in its sound discretion, to review, revise, reconsider and modify its interlocutory orders at any time prior to the entry of final

21

judgment.'"). Here, the judge had discretion to reconsider her earlier ruling, and she gave Group C ample time to address the issues before making her decision.

Citing our decision in Cho v. Trinitas Regional Medical Center, 443 N.J. Super. 461 (App. Div. 2015), decided after the trial in this case, Group C further contends that Penn National's in limine motion regarding the need for an expert was actually a thinly-veiled untimely motion for summary judgment. We agree.

In Cho, 443 N.J. Super. at 468-69, the trial judge granted the defendant's in limine motion to dismiss the plaintiff's complaint on the eve of trial. We reversed, noting "as a general rule, a motion in limine will not have a dispositive impact on a litigant's entire case." Id. at 470. Further, such motions should be granted sparingly "particularly . . . when the 'motion in limine' seeks the exclusion of an expert's testimony, an objective that has the concomitant effect of rendering a plaintiff's claim futile." Id. at 470-71. We concluded the judge's decision denied the plaintiff due process. Id. at 474-75.

During oral argument before the trial judge, Penn National's counsel asserted that only the judge's denial of the insurer's summary judgment motion one month earlier made it now necessary to challenge Group C's lack of an expert. We reject the argument as meritless. R. 2:11-3(e)(1)(E). Simply put, there was no good

22

reason why Penn National did not raise the lack of expert testimony as a basis to dismiss the claim at the same time it made its other arguments. Raising that specific argument on the eve of trial was improper.

Contrary to Penn National's argument, the result was not harmless, see Cho, 443 N.J. Super. at 474-75, because we also agree with Penn National and the judge that Group C needed an expert to prosecute its bad faith failure to settle claims in such a complex factual setting as here.

In Rova Farms Resort, Inc. v. Investors Insurance Co. of America, 65 N.J. 474 (1974), the Court recognized an insured's cause of action against its insurer for bad faith failure to settle a third-party claim in certain instances where the insurer rejects a settlement demand within the policy limits and the verdict following trial exceeds the policy limits. The Rova Farms Court explained that, if, under a liability insurance policy, the insurer reserves "full control of the settlement of claims against the insured, prohibiting him from effecting any compromise except at his own expense," the insurer has a fiduciary obligation to exercise good faith in settling those claims. Id. at 492. Thus, any decision not to settle

> "must be a thoroughly honest, intelligent and objective one. It must be a realistic one when tested by the necessarily assumed

expertise of the company." This expertise must be applied, in a given case, to a consideration of all the factors bearing upon the advisability of a settlement for the protection of the insured. While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more. It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial.

[Id. at 489-90 (emphasis in original) (quoting Bowers v. Camden Fire Ins. Assoc., 51 N.J. 62, 71 (1968)).]

In Wood v. New Jersey Manufacturer's Insurance Company, 206 N.J. 562, 571 (2011), the Court acknowledged that an assessment of the reasonableness of an insurer's settlement negotiations in the underlying action will likely hinge upon the credibility of fact witnesses, as well as expert testimony as to what went wrong on the settlement front and why. Mere rejection of an offer to settle within the policy limit and a verdict at trial in excess thereof is not enough by itself to establish bad faith. Radio Taxi Service, Inc. v. Lincoln Mutual Ins. Co., 31 N.J. 299, 305 (1960). "[T]he administration of the good faith test is not easy for either party to the insurance contract. . . . Considerations

of experience, expertise and judgment are particularly important and significant." Ibid.

In Pasha v. Rosemount Memorial Park, Inc., 344 N.J. Super. 350, 353-55 (App. Div. 2001), the insured assigned it rights under the insurance policy to the third-party plaintiffs following the insurer's disclaimer of coverage and the insured's direct settlement with the plaintiffs. See Griggs v. Bertram, 88 N.J. 347 (1982). We noted the importance of expert opinion in determining the reasonableness of the settlement — an element of the plaintiffs' claim — and agreed with the trial court that the plaintiffs failed to sustain their burden of proof, even though they had produced some expert testimony. Pasha, 344 N.J. Super. at 356-59.

Here, we need not explain in detail the complicated factual circumstances regarding Penn National's receipt of Group C's initial claim, its denial of coverage and decision to provide a defense under a reservation of rights, and, of course, the Law Division's original grant of summary judgment declaring that Penn National had no duty to defend or indemnify. All of these must be considered with reference to the timeline of the underlying action, including the ultimate certification of the class in federal court. In our mind, a jury was incapable of properly

considering whether Penn National breached its fiduciary duty to Group C without expert testimony.

Without the benefit of our decision in Cho, we understand the judge's denial of Group C's adjournment request, given the long and tortured history of the litigation. However, when Group C was essentially lulled into believing it could proceed without an expert by Penn National's unexcused failure to argue otherwise before the day of trial, the judge should have more appropriately adjourned the trial rather than dismiss the claim on this ground. Alternatively, the judge could have severed the bad faith claims and proceeded first with the coverage issue, a procedure she discussed with the attorneys before trial but ultimately did not need to employ. See Taddei v. State Farm Indem. Co., 401 N.J. Super. 449, 465 (App. Div. 2008) (suggesting severance of the first-party bad faith claim from underinsured motorist trial).

We therefore reverse the dismissal of Group C's bad faith failure to settle claim and remand the matter to the trial court for further proceedings.

As a result, we need not decide for now whether the judge properly applied Pickett's "fairly debatable" standard as another reason to dismiss the bad faith failure to settle claim. Group C argues Pickett is simply inapplicable to an insured's bad faith failure to settle a third-party claim. See Wood, 206 N.J. at 564

26

(explaining nature of <u>Rova Farms</u> bad faith failure to settle claim); <u>Badiali v. N.J. Mfrs. Ins. Gp.</u>, 220 N.J. 544, 554 (2015) (explaining "first-party bad faith claim for denial of benefits").

In <u>Taddei</u>, 401 N.J. Super. at 459, a case involving a first-party claim for uninsured motorist benefits, we explained:

> The remedy in <u>Rova Farms</u> was based on the unique fiduciary relationship that arose out of a general liability insurance policy. . . . The policy prohibited the insured from participating in the settlement of the third-party claim against it. . . . The Court found that this created a fiduciary duty on the part of the insurer to act in good faith in attempting to settle the claim. . . . This duty was of particular importance because the insured was personally liable for any damages in excess of the policy limit. . . . The Court reasoned that, in essence, an insurer choosing not to settle within the limits of coverage should not be permitted to gamble with its insured's money. . . .
>
> That rationale does not carry over to the first party context. The insured's assets are not placed at risk for failure to settle within the policy limits.

The same fiduciary duty is not implicated when an insurer simply refuses to defend under the policy.

In <u>Universal-Rundle Corporation v. Commercial Union Insurance Co.</u>, 319 N.J. Super. 223, 249-51 (App. Div. 1999), however, we held that the <u>Pickett</u> "fairly debatable" standard applied to an insured's bad faith third-party <u>coverage claim</u>, not a failure to settle claim. No reported New Jersey decision has addressed

27

whether Pickett's "reasonably debatable" standard applies to an insured's bad faith refusal to settle claim.

However, in American Hardware Mutual Insurance Company v. Harley Davidson of Trenton, Inc., 124 Fed. Appx. 107, 109 (3d Cir. 2005), the Third Circuit rejected the insurer's argument that Pickett applied to such a claim, explaining:

> Whether [the insured] would be held liable for [the third-party's] injuries was "fairly debatable," but in the context of a third-party claim with a possibility of an excess verdict, Pickett supplies only part of the equation. The "fairly debatable" standard is analogous to the probability liability will attach in a third-party claim, but it does not consider the likelihood of an excess verdict. A third-party claim that may exceed the policy limit creates a conflict of interest in that the limit can embolden the insurer to contest liability while the insured is indifferent to any settlement within the limit. This conflict is not implicated when the insured is a first-party beneficiary, where the claimant and the insurer are in an adversarial posture and the possibility of an excess verdict is absent. Rova Farms, not Pickett, protects insureds who are relegated to the sidelines in third-party litigation from the danger that insurers will not internalize the full expected value of a claim due to a policy cap.
>
> We conclude that the Rova Farms standard governs this case.
>
> [Id. at 112.]

Without deciding the issue, we acknowledge the appeal of the Third Circuit's rationale. An insurer who, while exclusively

A-0754-15T1

controlling the litigation, acts in bad faith and refuses to settle a third-party claim within its insured's policy limits exposes the insured to personal liability.  The situation therefore presents different concerns from those posed by a suit where the insurer acts in bad faith and wrongfully denies contractual benefits to the insured under its policy of insurance.

We also note our disagreement with Penn National's argument, accepted by the trial judge, that Group C's failure to negotiate a settlement when the insurer declined coverage was necessarily fatal to the bad faith claim.  In <u>Fireman's Fund</u>, 72 N.J. at 67-68, the insured, which had purchased a $50,000 primary liability policy with the defendant insurer, and a $250,000 excess policy with a second carrier, was presented with a $147,000 settlement demand, far less than the potential damages of $400,000 to $542,000 to which it was exposed.  After the defendant insurer refused to settle or contribute its $50,000, the insured, <u>with the financial cooperation of its excess carrier</u>, settled the case for $135,000. <u>Id.</u> at 68.  The insured then sued the defendant insurer, alleging bad faith refusal to settle and seeking $50,000 plus interest and punitive damages.  <u>Ibid.</u>

After the insured prevailed on its compensatory damages claim in both the trial and appellate courts, the matter came before the Supreme Court.  <u>Id.</u> at 67-68.  The Court ruled that, when an

insurer breaches its good faith obligation to settle, the insured

_may_ make a reasonable settlement and then seek reimbursement from

the insurer, even though the policy purports to avoid liability

for settlements made without the insurer's consent.  Id. at 71-

75.  According to the Court:

> The consequences of a breach of that obligation differ depending on whether, viewed as of the time the settlement offer is being considered, the potential award is within or beyond the limits of the policy.  If the potential loss is within the policy limits, then there is no reason to deprive the insurer — the only one appearing to have a pecuniary interest in the ultimate liability and the only source of the funds to be paid in settlement — of its absolute right to control the litigation. . . .  In such a situation, even though the insured may deem the refusal of the insurer to settle to be in bad faith, since _prima facie_ the insured's pecuniary interest does not appear to be involved, it is appropriate to hold that the insured has no alternative but to await the trial of the negligence action and, if it results in a judgment in the claimant's favor in excess of the policy limits, then to institute an action against the insurer to recover the amount of the policy limits and in addition the amount by which the judgment exceeded the amount for which the claimant was willing to settle. . . .
>
> A different situation is presented when, viewed as of the time the settlement offer is received, the potential loss and the proposed settlement exceed, as they did here by far, the limits of the policy.  In such a situation, the insured may, but he need not await the outcome of the trial of the negligence action. He should not "be required to wait until after

the storm before seeking refuge" when faced with "a potential judgment far in excess of the limits of the policy." . . . .

He should be and is permitted, as in other cases in which the insurer has breached its obligations, to proceed to make a prudent good faith settlement for an amount in excess of the policy limits and then, upon proof of the breach of the insurer's obligation and the reasonableness and good faith of the settlement made, to recover the amount of the policy limits from the insurer.

[Id. at 74-75 (emphasis added).]

The Fireman's Fund Court did not require, as a matter of law, that insureds enter into settlements at their own expense in order to protect their interests if an insurer refuses to settle a case. It merely held that under certain circumstances, insureds could do so without violating policy terms where there has been a breach by the insurer. The insured in Fireman's Fund had an excess carrier willing to assist it in achieving settlement; Group C had no other carrier to turn to.

In A-0754-15, we reverse in part, affirm in part and remand the matter to the trial court for further proceedings consistent with our opinion.

In A-0808-15, we reverse the dismissal of Group C's Rova Farms bad faith in failing to settle counterclaim and remand for further proceedings consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

31

A-0754-15T1